# Exhibit B2

2010 Patent Litigation Study

# The continued evolution of patent damages law

Patent litigation trends 1995-2009 and the
impact of recent court decisions on damages



PRICEWATERHOUSE COOPERS

# Table of contents

**The heart of the matter**                                                      2

## The impact of recent court decisions on patent damages law

**An in-depth discussion**                                                       4

## An analysis of trends in patent litigation

Summary of observations                                                          5
2009 saw a decrease in patent actions filed                                      6
Awards for NPEs are more than triple those for practicing entities               7
Wide disparity between jury and bench awards                                     9
Reasonable royalties are the predominant measure of damages                     12
NPE success rates as compared to practicing entities                            14
Win rates of alleged infringers increase when they are the plaintiff            17
Significant variations in median time-to-trial exist by jurisdiction            18
Certain federal district courts are more favorable to patent holders            21
36% of NPE decisions were concentrated in 5 federal district courts             23

**What this means for your business**                                           24

## Understanding the dynamics of patent litigation is critical to success

September 2010

The heart of the matter

# The impact of recent court decisions on patent damages law

As the world's largest corporations face increased threats of patent litigation from their competitors and from nonpracticing entities (NPEs), the debate over U.S. patent reform continues. In each of the last five Congressional sessions, variants of a Patent Reform Act have been introduced, yet none have become law. One of the most widely discussed topics in the patent reform debate has been the issue of damages. Some view recent case law as unfairly limiting a patentee's ability to recover adequate compensation, whereas others believe the current law frequently results in excessive jury awards.

While the legislative process has slowly taken its course, the courts continue to address the link between patent damages and the value of the patented feature. Several recent court opinions have focused on the tension between apportionment arguments and the entire market value rule, the latter allowing for the recovery of damages based on an entire product's sales value even when the patented feature is only one component of that product.

Two cases are particularly illustrative. First, in a March 2009 opinion in Cornell University v. Hewlett-Packard, the Court reduced damages to $53 million from $184 million, finding that the royalty base on which damages were calculated was overstated, as the patented element was but one of many components within other layers of components, all eventually embodied in servers and workstations. Then in September 2009, the US Court of Appeals for the Federal Circuit (CAFC) vacated a lower court's $368 million damages award in Lucent Technologies v. Gateway, remanding the case for a new trial on damages. The royalties originally awarded to Lucent were framed as a percent of the entire value of software sales, although the patented technology involved only one arguably minor feature (the date-picker calendar function) among numerous functionalities within Microsoft Outlook™. In both cases the courts determined that the entire market value rule had been improperly applied because the patented features did not drive demand for the entire product.

In addition, in the Lucent matter the CAFC placed increased emphasis on the comparability of licenses used in determining reasonable royalty damages, finding that the licenses used to calculate royalty damages were too different from any license that the parties would have negotiated, in both licensing terms and subject matter. In February 2010, the CAFC followed the Lucent decision with ResQNet.com v. Lansa, in which the damages award was reversed because the licenses used in determining damages were not reasonably related to the infringed technology.

Whether discussing the appropriateness of applying the entire market value rule or the reliance on historical licensing information in determining royalty rates, these decisions over the last year and a half indicate that courts are demonstrating an increased focus on linking damages awards to appropriate evidence regarding the economic value contributed by the patented technology. Interestingly, even without the passage of patent reform, these decisions suggest that courts can effectively serve as "gatekeepers" regarding damages calculations that are presented at trial.

An in-depth discussion

# An analysis of trends
# in patent litigation

# Summary of key observations

Reflecting on these developments, PricewaterhouseCoopers (PwC) has compiled and maintained a thorough database of patent damages awards (from 1980 through 2009), collecting information about patent holder success rates, time-to-trial statistics, and practicing versus nonpracticing entity statistics (all from 1995 through 2009). Based on this study, several observations can be made to help executives, legislators, and litigators assess their patent enforcement strategies, as well as the impact of NPEs.

- Annual median damages (in 2009 dollars) award has ranged from $2.4 million to $10.5 million between 1995 and 2009, with no discernable trend.

- Damages awards for NPEs have averaged more than triple those for practicing entities since 2001.

- The disparity between jury and bench awards continues to widen and is likely the contributing factor in the significant increase in use of juries since 1995.

- Reasonable royalties continue to be the predominant measure of damages awards.

- NPEs have been successful 31 percent of the time overall versus 40 percent for practicing entities, due to the relative lack of success for NPEs at summary judgment. However, both have about a 2/3 win rate at trial.

- Win rates of alleged infringers increase when they are the plaintiff. However, the increase is only significant when the patent holder is an NPE.

- While the median time-to-trial has remained fairly constant since 1995, significant variations exist between jurisdictions.

- Certain federal district courts (particularly Virginia Eastern, Delaware and Texas Eastern) continue to be more favorable to patent holders, with shorter time-to-trial, higher success rates and higher median damages awards.

- Five federal district courts accounted for 36 percent of all identified decisions involving an NPE as the patent holder.

## 2009 saw a decrease in patent actions filed

As Chart 1 illustrates, since 1991 the annual number of patent actions filed has increased at an overall compound annual growth rate (CAGR) of 4.8 percent.

Meanwhile, the number of patents granted by the USPTO has also grown steadily,

increasing at a CAGR of 3.5 percent since 1991. However, in 2009, while the number of patents granted by the PTO continued to rise, the number of patent actions filed actually dropped to 2,744, a decrease of over six percent from 2008. This broke a three-year trend of growth in case filings, since the last drop in 2005.

**Chart 1: Patent case filings and grants**



Patent cases ——    Patents granted ——

Years are based on June year-end
Sources: *US Patent and Trademark Office: Performance & Accountability Report and US Courts: Judicial Facts & Figures*

## Awards for NPEs are more than triple those for practicing entities

Adjusting for inflation using the Consumer Price Index (CPI), the annual median damages award has ranged from $2.4 million to $10.5 million between 1995 and 2009, with an overall median award of $5.2 million over the last 15 years. In the aggregate, however, there is no discernable trend over the total time period.

That said, as shown in Chart 2b, a wide variance exists in the damages awarded to NPEs as compared to practicing entities since 2001. The median damages award for NPE patent holders was more than triple the award for practicing entities over the last eight years. Between 2002 and 2009, the median was $12.9 million for NPEs and $3.9 million for practicing entities. In contrast, from 1995 to 2001, the median

**Chart 2a: Patent holder median damages awarded: 1995–2009**



Median damages are adjusted for inflation and represented in 2009 US dollars

**Chart 2b: Patent holder median damages awarded: Nonpracticing entities vs. Practicing entities**



■ Nonpracticing entities  ■ Practicing entities

An in-depth discussion                PricewaterhouseCoopers                7

damages award was approximately 20 percent higher for practicing entities, in the $5-6 million range.

Massive damages awards continue to make corporate management keenly aware of the risks of potential infringement, as well as the rewards of enforcing patent rights. Chart 2c below displays the top ten damages awards in federal district court decisions identified

since 1995. Interestingly, three of the top ten largest initial awards identified since 1995 occurred in 2009.

It is important to note that the awards reflected in Chart 2c are as of initial adjudication — some of these awards have since been vacated, remanded or reduced, and some are still in the appellate process.

**Chart 2c: Top 10 largest initial adjudicated damages awards: 1995–2009**

| Year | Plaintiff | Defendant | Technology | Award (in MM) |
|------|-----------|-----------|------------|---------------|
| 2009 | Centocor Ortho Biotech Inc. | Abbott Laboratories | Arthritis drugs | $1,848 |
| 2007 | Lucent | Microsoft Corp. | MP3 technology | 1,538 |
| 2003 | Eolas Technologies | Microsoft Corp. | Internet Browser | 521 |
| 2008 | Bruce N. Saffran M.D. | Boston Scientific Corp. | Drug-eluting stents | 432 |
| 2009 | Uniloc U.S.A. Inc. | Microsoft Corp. | Software licensing technology | 388 |
| 2008 | Lucent | Gateway | Data entry technology | 368 |
| 2006 | Rambus | Hynix | Memory chips | 307 |
| 2009 | i4i Limited Partnership | Microsoft Corp. | Electronic document manipulation technology | 277 |
| 2008 | Medtronic | Boston Scientific | Balloon-dilation catheters | 250 |
| 2007 | DePuy Spine | Medtronic | Spinal implant devices | 226 |

## Wide disparity between jury and bench awards

The disparity between jury and bench awards has widened and is likely a contributing factor to the significant increase in the use of juries over the last decade.

A significant trend toward jury trials has emerged since the 1980s, with the shift becoming more evident over the last decade. As shown in Chart 3a, juries decided only 14 percent of cases during the 1980s and 24 percent during the 1990s. In this decade, juries have decided 53 percent of cases.

As reflected in Chart 3b, in 2009, jury trials represented almost 70 percent of total identified cases, indicating that, in the most recent years, juries have clearly become the preferred trier of fact.

**Chart 3a: Use of Bench vs. Jury trials by decade**



**Chart 3b: Use of Bench vs. Jury trials by year: 2001–2009**



A number of factors contribute to the increased use of juries as the preferred forum for patent cases. Trial success rates for patent holders are much higher when decided by juries as compared to bench trials. In fact, jury success rates have consistently outperformed their bench counterparts every year since 1995, as shown in Chart 3c. Furthermore, juries' lead over the bench in trial success rates broadened dramatically in 2009, to about 37 percent higher for juries.

As shown in Chart 3d, the increase in litigation involving NPEs over the last decade may be affecting the increased use of juries. Since 1995, 56 percent of trials involving NPEs have been jury trials, as compared to only 43 percent of trials involving practicing entities.

**Chart 3c: Bench vs. Jury trials: Success rates 1995–2009**



**Chart 3d: Use of Bench vs. Jury trials by type of entity: 1995–2009**



Furthermore, recent awards by juries have been significantly greater, running several multiples of the amounts awarded by judges. Chart 3e shows the discrepancy in median damages awards over the last three decades. While jury awards have risen sharply, the median bench award has decreased significantly since the beginning of 2000. A number of reasons may account for the increase in median jury damages awards.

The increase in damages awarded by juries in patent cases may be due to juries' reduced sensitivity to large dollar awards with public disclosures of larger profits and net worth from major company defendants.

Greater outrage at a finding of liability to punish the infringer rather than merely compensate the patent holder may also be a factor in increased damages awards. Self-selection bias could also play a part, as plaintiffs may believe juries will look more favorably upon them than judges, especially when seeking large monetary awards.

Chart 3f indicates that regardless of whether an entity practices its patent(s), damages awarded from juries are much greater than those awarded from bench trials. The premiums in jury awards for NPEs are even higher than those for practicing entities.

**Chart 3e: Bench vs. Jury trials: Median damages awarded by decade**



**Chart 3f: Bench vs. Jury trials: Median damages by entity type: 1995–2009**



## Reasonable royalties are the predominant measure of damages

As shown in Chart 4, reasonable royalties are the most frequent basis of damages awards in patent cases and comprise a greater share with each passing year. Section 284 of the Federal Code, governing equitable compensation, sets a reasonable royalty as the minimum level of compensation due to the patent holder from an infringer. While Chart 4 includes all identified decisions with damages, NPEs are generally not entitled to lost profits. Consequently, if NPE results are excluded from Chart 4, the proportion of damages awarded through reasonable royalties would decrease by about 6 percent.

**Chart 4: Composition of damages awards to all entities**



■ Price erosion    ▨ Lost profits    ▥ Reasonable royalty

The continued evolution of patent damages law

Lost profits damages are not as prevalent for several reasons:

- The increased proportion of patent actions brought by NPEs, which are generally ineligible for lost profits damages because they do not make products / services embodying their patents.

- Even in circumstances where the patentee may be eligible for lost profits awards, it may elect to seek recovery through the royalty approach. The complexity and cost of the analysis for determining lost profits is greater than for reasonable royalties. Lost profits may be quantified based upon specific sales taken by the infringer from the patent holder or upon an assessment of particular facts and circumstances in a "but for" situation. This assessment examines whether there is demand for the product tied to the patent's claims; there is an absence of acceptable alternate substitutes; the patent holder has adequate manufacturing and marketing capabilities;

and there is sufficient financial information to complete the quantification. Also, market share data is often required to allocate the infringer's sales if the market consists of more than two participants. Patent holders often find the process of supporting such analysis distracting to their core operations, or they do not want to risk disclosing proprietary cost and profit information.

- Lost profits can be more difficult to prove. The proliferation of competition in each US market sector from US and foreign-based businesses provides greater access to substitute products. The presence of these alternatives means that even without an infringer's products in the market, consumers may not automatically buy the patent holder's products. Furthermore, the growing use of specialized distribution channels for reaching a specific consumer demographic increasingly supports an infringer's contention that its customers are separate and distinct from those of the patent holder.

## NPE success rates as compared to practicing entities

To understand patent holder success rates for NPEs versus practicing entities since 1995, PwC studied 1,587 final decisions issued at two stages of the litigation process: summary judgment (843 decisions) and trial (668 decisions). Dismissals that did not occur at trial or summary judgment are not included in this breakdown. Chart **5a** demonstrates that, overall, NPEs were successful 31 percent of the time versus 40 percent for practicing entities. This difference can be attributed to the relative lack of success for NPEs at summary judgment, as compared to practicing entities. In instances when a final decision is made at summary judgment, NPEs are successful only 13 percent of the time, as opposed to 20 percent for practicing entities. The trial success rates are nearly identical for NPEs and practicing entities.

**Chart 5a: Patent holder success rates: 1995–2009**



■ Nonpracticing entities    ■ Practicing entities

While practicing entities seem to have a higher overall historical success rate since 1995 when compared to NPEs, Chart 5b depicts an interesting trend in success rates since 2005. Although success rates for practicing entities and NPEs were relatively close in the early part of this decade, NPEs have become more successful in recent years, winning 48 percent of the time in 2009, up from a decade-low of 23 percent in 2005. Meanwhile, practicing entities have seen

their win rates decrease at a steady rate, from a decade-high of 54 percent in 2005 to a decade-low of 34 percent in 2009.

Studying trial success rates for bench versus jury trials sheds further light. Chart 5c illustrates that since 1995, while both practicing entities and NPEs have been more successful with jury than bench trials, practicing entities enjoy a slightly higher success rate than NPEs with the bench.

**Chart 5b: Patent holder success rates: 2001–2009**



**Chart 5c: Patent holder success rates at trial: 1995–2009**



Another interesting finding is that a greater percentage of NPE cases are decided or concluded at summary judgment than cases involving practicing entities. Chart 5d shows that 60 percent of NPE final decisions occur at summary judgment versus 52 percent for practicing entities. Because success rates at summary judgment are much lower than at trial, NPEs tend to experience a lower overall success rate than practicing entities, when the total mix of summary judgment and trial decisions are considered.

**Chart 5d: Percent of decisions at summary judgment: 1995–2009**



The continued evolution of patent damages law

## Win rates of alleged infringers increase when they are the plaintiff

Declaratory judgments (where alleged infringer asserts the patents are invalid, unenforceable, or not infringed by its products) represent 9 percent of all cases identified. Chart 6 suggests that since 1995, alleged infringers have had more success in declaratory judgment actions against NPEs than versus practicing entities (55 percent versus 43 percent). Alleged infringers have also been somewhat more successful at trial in their more normal posture as defendants against NPEs than practicing entities (46 percent versus 41 percent). In summary, it appears that alleged infringers benefit from filing declaratory actions, however that benefit is only significant against NPEs (55 percent win rate as plaintiff against NPE versus 46 percent win rate as defendant against NPE).

**Chart 6: Alleged infringer win rate at trial from 1995–2009**



## Significant variations in median time-to-trial exist by jurisdiction

Data for time-to-trial was obtained for 540 trials in 68 districts, using the court dockets for each matter. Time-to-trial was calculated from the complaint date to the first day of trial for each case. In Chart 7a, the distribution of overall time-to-trial indicates that 69 percent of cases reached trial within three years from the filing date of the initial complaint.

Overall no major changes in time-to-trial are noted since 1998. Chart 7b shows that after a decline from 1995 to 1998, median time-to-trial has maintained a fairly steady duration at just over two years from the complaint date to trial, even as the volume of cases has increased substantially over this time. As reflected in Chart 7b, the number of cases going to trial has hovered around fifty-five to sixty-five cases per year in the last four years, up from twenty to forty cases per year in the preceding decade.

Chart 7a: Time-to-trial distribution of cases: 1995–2009



Chart 7b: Median time-to-trial: 1995–2009



The continued evolution of patent damages law

Not surprisingly, the median damages award increases with time-to-trial. Chart 7c reflects the median damages award depending on the number of years to trial. Several factors may be responsible for this relationship, including the fact that cases involving higher potential damages awards are more complex and thus take longer to reach trial. In addition, the longer time-to-trial provides a longer period over which damages may be calculated, thereby increasing the potential damages base.

**Chart 7c: Median damages based on time-to-trial: 1995–2009**



An in-depth discussion

Since 1995, however, significant variations have occurred in the median of time-to-trial across jurisdictions. To assess the lead time, PwC focused on the most active districts. Among these courts, Chart 7d summarizes the median time-to-trial from 1995 to 2009. Based upon the cases identified, Virginia Eastern and Wisconsin Western districts have the shortest time-to-trial. The median time-to-trial increased by 0.16 years from our prior study, caused by an average time-to-trial of 2.4 years for cases coming to trial in 2009.

**Chart 7d: Median time-to-trial by district from 1995–2009**

| Rank | District | Total # of identified decisions with time-to-trial data | In years |
|------|----------|-------------------------------------------------------|----------|
| 1 | Virginia Eastern District Court | 13 | 0.93 |
| 2 | Wisconsin Western District Court | 9 | 1.07 |
| 3 | Florida Middle District Court | 12 | 1.71 |
| 4 | Delaware District Court | 91 | 1.89 |
| 5 | Texas Southern District/ Bankruptcy Courts | 10 | 2.00 |
| 6 | Texas Eastern District Court | 57 | 2.04 |
| 7 | Florida Southern District Court | 11 | 2.27 |
| 8 | California Central District Court | 24 | 2.28 |
| 9 | Texas Northern District Court | 17 | 2.42 |
| 10 | Minnesota District Court | 10 | 2.45 |
| 11 | New York Southern District Court | 34 | 2.50 |
| 12 | New Jersey District Court | 13 | 2.71 |
| 13 | California Northern District Court | 31 | 2.95 |
| 14 | Illinois Northern District Court | 34 | 3.42 |
| 15 | Massachusetts District Court | 23 | 3.64 |
| | Overall (All decisions identified) | | 2.27 |

Only includes the 15 most active districts for which time-to-trial data was available.

## Certain federal district courts are more favorable to patent holders

Considering median time-to-trial, median damages awarded, and trial win rates, certain jurisdictions (particularly Virginia Eastern, Delaware and Texas Eastern) emerge as being more favorable venues for patent holders, with shorter time-to-trial, higher success rates and higher median damages awards. Chart 8a presents the top 15 districts based on an equally weighted average of their respective categorical rankings for each of the three statistical measures mentioned above for decisions from 1995 to 2009.

**Chart 8a: District court rankings: 1995–2009**

| Overall Rank | District | Median Time-to-trial (in years) | Rank | Overall Success Rate | Rank | Median Damages Awarded | Rank |
|---|---|---|---|---|---|---|---|
| 1 | Virginia Eastern District Court | 0.93 | 1 | 45.9% | 5 | $30,331,418 | 1 |
| 2 | Delaware District Court | 1.89 | 4 | 47.3% | 3 | $21,640,580 | 2 |
| 3 | Texas Eastern District Court | 2.04 | 6 | 55.3% | 2 | $19,722,995 | 3 |
| 4 | Florida Middle District Court | 1.71 | 3 | 59.1% | 1 | $398,406 | 15 |
| 5 | California Central District Court | 2.28 | 8 | 47.0% | 4 | $6,417,074 | 8 |
| 6 | Texas Southern District/ Bankruptcy Courts | 1.99 | 5 | 32.4% | 12 | $10,531,957 | 5 |
| 7 | Wisconsin Western District Court | 1.07 | 2 | 32.4% | 12 | $4,511,181 | 10 |
| 8 | California Northern District Court | 2.95 | 13 | 33.0% | 10 | $7,462,530 | 6 |
| 8 | Texas Northern District Court | 2.42 | 9 | 45.2% | 6 | $1,675,470 | 14 |
| 10 | Illinois Northern District Court | 3.42 | 14 | 34.6% | 9 | $7,416,732 | 7 |
| 10 | Minnesota District Court | 2.45 | 10 | 35.0% | 8 | $2,261,103 | 12 |
| 10 | New Jersey District Court | 2.71 | 12 | 32.2% | 14 | $16,601,427 | 4 |
| 13 | Massachusetts District Court | 3.64 | 15 | 39.1% | 7 | $5,057,511 | 9 |
| 14 | New York Southern District Court | 2.50 | 11 | 32.7% | 11 | $3,117,994 | 11 |
| 15 | Florida Southern District Court | 2.27 | 7 | 26.5% | 15 | $2,061,851 | 13 |
| | Overall (all decisions identified) | 2.27 | | 38.1% | | $5,229,497 | |

Median damages are adjusted for inflation and represented in 2009 US dollars.
The ranking for these courts are based on their relative ranking for each of the remaining statistical measures.

In combining summary judgment and trial decisions, Charts 8b and 8c include those districts with greater than 20 cases and rank them according to overall success rates.

**Chart 8b: Top 5 districts by overall success ranking: 1995–2009**

|   | Top 5 Districts | Overall Success Rate | Trial Success Rate |
|---|---|---|---|
| 1 | Florida Middle District Court | 59.1% | 80.0% |
| 2 | Texas Eastern District Court | 55.3% | 66.7% |
| 3 | Delaware District Court | 47.3% | 64.5% |
| 4 | California Central District Court | 47.0% | 72.4% |
| 5 | Virginia Eastern District Court | 45.9% | 70.6% |
|   | Overall (all decisions identified) | 38.1% | 66.0% |

**Chart 8c: Bottom 5 districts by overall success ranking: 1995–2009**

|   | Bottom 5 Districts | Overall Success Rate | Trial Success Rate |
|---|---|---|---|
| 1 | Florida Southern District Court | 26.5% | 42.9% |
| 2 | New Jersey District Court | 32.2% | 57.9% |
| 3 | Texas Southern District/Bankruptcy Courts | 32.4% | 66.7% |
| 3 | Wisconsin Western District Court | 32.4% | 70.0% |
| 5 | California Northern District Court | 33.0% | 71.1% |
|   | Overall (all decisions identified) | 38.1% | 66.0% |

## 36% of NPE decisions were concentrated in 5 federal district courts

As depicted in Chart 9, cases with an NPE as the patent holder were concentrated in a relatively small number of key districts. The top five districts with the most identified decisions accounted for 36 percent of all identified NPE cases. The top 10 districts accounted for 52 percent of all identified NPE decisions. Of particular interest is the fact that the two districts with the most

identified NPE decisions, Illinois Northern and Texas Eastern, present a dichotomy in relative NPE success rates. Illinois Northern ranks seventh-lowest in terms of NPE success rates, whereas Texas Eastern ranks third-highest. Meanwhile, Delaware, which has the lowest percentage of identified decisions where the patent holder is an NPE, has an overall success rate for NPEs of 63 percent, trailing only Florida Middle with an overall success rate of 67 percent.

**Chart 9: District courts with most identifed decisions with NPE as patent holder: 1995–2009**

| District | Decisions Involving NPEs | Total Identified Decisions | NPE % of Total Decisions | NPE Success Rate |
|---|---|---|---|---|
| Illinois Northern District Court | 27 | 130 | 20.8% | 18.5% |
| Texas Eastern District Court | 27 | 85 | 31.8% | 55.6% |
| New York Southern District Court | 25 | 113 | 22.1% | 16.0% |
| California Northern District Court | 16 | 109 | 14.7% | 25.0% |
| Delaware District Court | 16 | 146 | 11.0% | 62.5% |
| Massachusetts District Court | 13 | 64 | 20.3% | 30.8% |
| Florida Southern District Court | 11 | 34 | 32.4% | 27.3% |
| California Central District Court | 10 | 66 | 15.2% | 50.0% |
| Minnesota District Court | 8 | 40 | 20.0% | 50.0% |
| Pennsylvania Eastern District Court | 8 | 34 | 23.5% | 12.5% |
| DC District Court | 7 | 17 | 41.2% | 28.6% |
| Kansas District Court | 7 | 15 | 46.7% | 14.3% |
| Florida Middle District Court | 6 | 22 | 27.3% | 66.7% |
| Texas Northern District Court | 6 | 31 | 19.4% | 33.3% |
| Virginia Eastern District Court | 6 | 37 | 16.2% | 50.0% |
| Wisconsin Western District Court | 6 | 34 | 17.6% | 0.0% |
| Colorado District Court | 5 | 17 | 29.4% | 40.0% |
| Connecticut District Court | 5 | 20 | 25.0% | 0.0% |
| Michigan Eastern District Court | 5 | 33 | 15.2% | 0.0% |
| All Identified Decisions | 308 | 1,587 | 19.4% | 30.8% |

What this means for your business

# Understanding the dynamics of patent litigation is critical to success

In light of the findings in this study, and despite the current debate over patent reform, patent litigation continues to be utilized as a protection and monetization path for patent holders. Both the number of patents granted by the USPTO and infringement actions filed continue to be significant, while the median damages award in 2009 was near its all-time high at about $9 million. This suggests that IP will continue to play an important role in the economy, and represent an important competitive advantage for companies to realize value.

Although recent court decisions and future legislation may influence patenting activities and the litigation process, for now the courts continue to reward patent holders by upholding the validity, enforceability, and infringement of their patents. With US patent trial success rates near their highest level in history, patent holders are winning considerable awards of damages. The largest ever patent damages award of over $1.8 billion was awarded in 2009, although that case is not yet through the appeals phase.

The forum and venue of a case can have a substantial influence on the outcome and should be carefully considered. Trials before juries, particularly in certain notable districts, tend to produce substantially higher success rates and awards. Potential litigants should consider the choice of venue and trier of fact when strategizing how and where to respond to alleged / suspected infringements.

Patent litigation brought by NPEs has been partially responsible for the increased calls for patent reform. While median awards for NPEs have been significantly higher than for practicing entities, NPEs' overall success rates have been significantly lower. NPEs will continue to be frequent participants in patent litigation, having been involved in almost 20 percent of reported decisions since 1995.

## Methodology

To study the trends related to patent deci-
sions, PricewaterhouseCoopers identified
final decisions at summary judgment and at
trial recorded in two WestLaw databases,
Federal Intellectual Property -- Cases (FIP-
CS) and Combined Jury Verdicts and Settle-
ments (JV-ALL), as well as in corresponding
PACER records. The study focuses on 1,587
district court patent decisions issued since
1995. Key definitions for certain terms used
throughout the study are listed below:

- Cases decided at summary judgment
  included those district court patent
  infringement cases where a response to a
  motion that could affect the final decision
  on infringement (patent invalidity or nonin-
  fringement) was decided by a judge.

- Cases decided at trial included those
  district court patent infringement cases
  where an opinion was rendered by a
  judge or jury at trial.

- A "success" included instances where
  a liability and damages (if included)
  decision was made in favor of the patent
  holder. Chart 6 only defines success
  from the alleged infringer's perspective.

- Time-to-trial" was calculated from the
  complaint date to the first day of either
  the bench or jury trial for each case.

- A "nonpracticing entity" is defined as an
  entity that does not have the capabili-
  ties to design, manufacture, or distribute
  products that have features protected by
  the patent.

## About the authors

**Chris Barry** is a partner in the Forensic Services practice of Pricewaterhouse-Coopers, located in Boston, where he has worked for over 26 years. Before joining PricewaterhouseCoopers, he gained several years' auditing experience with other major CPA firms. Mr. Barry earned a BA in accounting from Franklin & Marshall College and an MBA from the University of California at Berkeley, and is a CPA, holding the AICPA credential of certified in financial forensics. Mr. Barry has worked extensively in the intellectual property field, including damage quantification and testimony in infringement actions, determining reasonable royalty rates, valuing IP for transaction purposes, and performing royalty audits for licensors with running rate agreements. He was listed as one of the world's top IP strategists in the 2009 iam250 publication, and is a member of the Licensing Executives Society. He has testified at trial roughly 50 times as an expert witness.

**Alex Johnston** is a Director in the Forensic Services practice of Pricewaterhouse-Coopers in Atlanta. He has been involved in many aspects of economic damages analysis in commercial disputes. His experience includes providing discovery assistance, developing financial models, preparing financial analysis, analyzing opposing expert damage claims and providing expert testimony in federal court through deposition and trial. Mr. Johnston received his BA degree in Economics from Rollins College and holds an MBA and JD from the University of Florida.

**Ronen Arad** is a director in the Forensic Services practice of Pricewaterhouse-Coopers, in the Atlanta office. He has been involved in many aspects of economic damages analysis in intellectual property disputes, including providing expert witness services, preparing damages assessments, and analyzing opposing expert claims. Mr. Arad has also assisted with various financial consulting engagements, including licensing

examinations of reported royalties, business valuations, and return on investment analyses. Mr. Arad is a Chartered Financial Analyst (CFA) charter-holder and holds a BS degree in Commerce with concentrations in Finance and Accounting from the University of Virginia.

**David Stainback** is a Director in the Forensic Services practice of Pricewater-houseCoopers in Atlanta. He has experience providing economic and monetary damages analysis in areas including patent infringement, breach of contract, trademark infringement, and consumer litigation. Mr. Stainback also has significant experience in other areas of financial consulting, including valuation analysis, business analytics and financial modelling for decision-making purposes and enterprise-wide transformation. Mr. Stainback received his AB in Economics from Princeton University and holds an MBA from Duke University - The Fuqua School of Business.

**Landan Ansell** is a Senior Associate in the Forensic Services practice in Atlanta. He specializes in financial analysis and modeling and forensic accounting matters, with a primary focus on the valuation of economic damages for commercial disputes. Mr. Ansell earned a BBA with a concentration in accounting from Emory University and is a CPA.

**Mike Arnold** is a Senior Associate in the Forensic Services practice based in Boston. He focuses on dispute analysis in commercial litigation, including performing IP valuation and damage quantification services in patent matters. He holds a degree in Accounting from Oregon State University and is a CPA.

pwc.com/us/forensics

To have a deeper conversation about how this
subject may affect your business, please contact:

Chris Barry
Partner
(617) 530-6304
christopher.c.barry@us.pwc.com

Ted Martens
Partner
(646) 471-7340
ted.martens@us.pwc.com

Larry Ranallo
Partner
(214) 754-5298
lawrence.f.ranallo@us.pwc.com

Chel Tanger
Principal
(678) 419-8464
chelton.d.tanger@us.pwc.com

© 2010 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP, a Delaware limited liability partnership, or, as the context requires, the PricewaterhouseCoopers global network or other member firms of the network, each of which is a separate and independent legal entity. This document is for general information purposes only, and should not be used as a substitute for consultation with professional advisors. NY-11-0125