

FILED

OCT - 5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**VS TECHNOLOGIES, LLC**

Plaintiff,

v.      Civil Action No. 2:11cv43

**TWITTER, INC.,**

Defendant.

## ORDER AND OPINION

This matter is before the Court on Defendant Twitter, Inc.'s ("Twitter" or "Defendant") Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial, Doc. 57. On September 30, 2011, the Court conducted a hearing and ruled from the bench. The Court **DENIED** Twitter's Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial. This Opinion and Order sets forth the reasons for the Court's ruling.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

The United States Patent and Trademark Office issued Patent No. 6,408,309 (the "'309 patent"), entitled "Method and System for Creating an Interactive Virtual Community of Famous People," on June 18, 2002. The named inventor, Dinesh Agarwal, is the prosecuting attorney, founding member, and Manager of VS Technologies, Inc.

The abstract of the '309 patent describes the invention as follows:

> A method and system for creating an interactive virtual community of famous people, or those people who wish to attain the status of a famous person, in a field of endeavor, such as arts, accounting, animal rights, business, education, engineering, entertainment, financing, government affairs, human rights, legal,

---

[1] This section does not constitute the entire factual background and procedural history. Rather, it details only those aspects of the facts and procedural history relevant to the issues presently before the Court.

medical, philanthropy, politics, religion, research, science, sports, etc. The virtual community of the present invention is unique in that the members of the virtual community can update, modify or revise their individual profile, and interact with other members of the virtual community, as well as the non-members of the virtual community.

On January 18, 2011, VS Technologies, Inc. ("VS Technologies" or "Plaintiff") filed its complaint alleging infringement of United States Patent No. 6,408,309 (the "'309 patent"). Doc. 1. Plaintiff served its patent infringement complaint on Defendant on February 8, 2011. On March 17, 2011, Defendant filed its answer and affirmative defenses. Doc. 15.

On May 2, 2011, the Court ordered that the parties submit their joint claim construction statement on August 8, 2011, and that, if the Court determines that a <u>Markman</u> hearing is necessary, such a hearing would be held on September 15, 2011. Doc. 31. Pursuant to the Court's order, Plaintiff and Defendant filed a joint claim construction statement on August 8, 2011. Doc. 47. Upon consideration of the joint claim construction statement, the Court determined that a <u>Markman</u> hearing was desirable. In accordance with the briefing schedule mandated by the court (<u>See</u> Doc. 49), Plaintiff and Defendant filed their respective claim construction briefs on August 24, 2011. Docs. 51–52. On September 15, 2011, the Court conducted a <u>Markman</u> hearing for the purpose of construing the claims in Plaintiff's patent at issue. After careful consideration of the parties' briefs and oral argument, the Court ruled from the bench and entered an order and opinion on September 23, 2011 detailing the claim constructions and reasons therewith. Doc. 86.

Defendant filed a motion for summary judgment on September 6, 2011 and memorandum in support thereof. Docs. 55–56. On September 19, 2011, Plaintiff filed a redacted memorandum in opposition to the motion for summary judgment, Doc. 70, and a motion for leave to file its opposition to Twitter's motion for summary judgment and accompanying

exhibits under seal, Doc. 71. Accordingly, Plaintiff's memorandum in opposition and accompanying exhibits were filed under seal on September 21, 2011. Docs. 74–79. After providing public notice of the motion to seal by posting an appropriate Notice on the public docket board, the Court ordered that Plaintiff's memorandum in opposition to the motion for summary judgment and accompanying exhibits be maintained under seal by the Clerk. Doc. 85. Defendant filed its reply on September 23, 2011. Doc. 83.

On September 7, 2011, Twitter filed its Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial, Doc. 57, and a redacted memorandum in support of its motion to strike, Doc. 58. Twitter also filed a motion for leave to file the memorandum in support of its motion to strike and accompanying exhibits under seal. Doc. 59. After providing public notice of the motion to seal by posting an appropriate Notice on the public docket board, the Court ordered that Twitter's Memorandum in Support of Twitter's Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial be maintained under seal. Doc. 65. VS Technologies filed its response on September 19, 2011, Doc. 67, along with a motion to seal the memorandum, Doc. 68. VS Technologies' motion to seal was granted by the Court on September 26, 2011, Doc. 84. Twitter filed its reply on September 26, 2011, also under seal. Doc. 90. The Court conducted a hearing on September 30, 2011.

A five-day jury trial in this case is scheduled to commence on October 24, 2011.

## II. STANDARD OF REVIEW

The court is obligated to serve as gatekeeper where expert opinion evidence is offered to determine whether an expert witness is qualified and whether an expert opinion is grounded in objective underlying scientific methodology, as opposed to mere speculation or conjecture. Daubert v. Merrill Dow Pharms., Inc., 509 U.S. 579, 589–90, 595 (1993); Kumho Tire

Co. v. Carmichael, 526 U.S. 137, 141–42 (1991). The Court's obligation is codified in the Federal Rules of Evidence 702 and 703. The applicable rule governing admissibility of testimony by experts is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702; see also Advisory Committee Notes to Rule 702, 2000 Amendments ("A review of the case law after Daubert shows that the rejection of expert testimony is the exception rather than the rule.").

The applicable rule governing the legitimacy of underlying bases of opinion testimony by experts is Federal Rule of Evidence 703, which provides in part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed. R. Evid. 703.

In other words, expert testimony that can assist the trier of fact is to be admitted at trial where the witness is qualified and a preliminary assessment of his testimony finds "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–93. In order to qualify as an expert, an individual must possess the requisite knowledge, skill, experience, training or education. Virginia Vermiculite, Ltd. v. W.R. Grace & Co. Conn. & The Historic Green Springs, Inc., 98 F. Supp. 2d 729, 732 (W.D. Va. 2000). An expert need not

4

"possess all five requisites—as long as he possesses one, he may be deemed an expert." Id. Rule 702 was intended to liberalize the introduction of relevant expert evidence. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999); see also Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989) (recognizing that the test for exclusion of an expert is a strict one). As such, a court need not determine whether the expert's testimony is correct, but should leave such conclusions to the jury after "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." Westberry, 178 F.3d at 261 (quoting Daubert, 509 U.S. at 596). However, courts also must be mindful that experts have the potential to be misleading if their testimony is not reliable. Expert testimony with a greater potential to mislead than to aid the jury should be excluded. See Westberry, 178 F.3d at 261 (citing United States v. Dorsey, 45 F.3d 809, 815–16 (4th Cir. 1995)).

### III. ANALYSIS

VS Technologies designated Larry W. Evans ("Evans"), an attorney with experience negotiating patent licenses, as a damages expert. On the issue of damages, Evans' opinion is based on the following: "(1) an analysis of comparable acquisitions of technology; (2) a calculation of how use of the infringing feature has led to increased use of the Twitter system and revenue to Twitter; and (3) a calculation of the expected incremental economic benefit attributable to the infringing feature and how in his experience, that benefit would have been shared between Twitter and VS Technologies." Doc. 67 at 2.

In making a reasonable royalty calculation, the expert ascertains the royalty scheme that would have been agreed upon in a "hypothetical negotiation" between a "willing licensor and willing licensee" had an agreement been successfully negotiated just before infringement began.

Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); Wordtech Sys., Inc. v. Integrated Network Solutions Corp., 609 F.3d 1308, 1319 (Fed. Cir. 2010). "Any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1325 (Fed. Cir. 2009) (quoting Unisplay, S.A. v. Am. Elec. Sign Co., Inc., 69 F.3d 512, 517 (Fed. Cir. 1995)). "Although some approximation is permitted in calculating the reasonable royalty, the Federal Circuit requires 'sound economic and factual predicates' for that analysis." IP Innovation, LLC v. Red Hat, Inc., 705 F. Supp. 2d 687, 689 (E.D. Tex. 2010).

Twitter moves to exclude Evans' testimony on the basis that his reasonable royalty calculation is lacking in sound economic and factual predicates. Specifically, Twitter asserts that Evans "adopts his own interpretation of Twitter's 'new user engagement' statistics—which have nothing to do with Twitter's revenues—and uses these percentages to calculate the purported 'incremental revenue' of $73,187,900 to $102,463,060 that Twitter supposedly will garner from its alleged infringement of the '309 patent." Doc. 63 at 2. Based upon his "incremental revenue" calculations, Evans renders the opinion that "VS Technologies would be entitled to somewhere between 15% and 40%" of those calculations, which would be somewhere between $10,978,000 and $40,985,200. Id. at 3. Evans then opines that Twitter "would have agreed to pay VS Technologies a lump sum (paid-up) royalty of at least $20 to $25 million reflecting a reasonable share of Twitter's actual and projected incremental revenue from use of the patented technology." Evans Report at ¶ 63.

First, Twitter contends that Evans improperly relies upon financial projections for Twitter that arose after the date of the hypothetical negotiation and includes revenues for Twitter's whole business, while ignoring the fact that Twitter has never turned a profit. Doc. 63 at 6. Second,

Twitter asserts that Evans' approach in calculating "incremental revenue" figures purportedly representing the economic benefit to Twitter of its alleged infringement is flawed. Specifically, Twitter claims that the 5%-7% figures used by Evans to measure the "engagement" of new Twitter users does not translate into Twitter's revenues because of the limited period those figures cover.[1] According to Twitter, even if Evans could show some relationship between increased new user engagement and Twitter's revenues, "he fails to explain how this results in a corresponding 5%-7% increase in Twitter's revenues." Id. at 9. Third, Twitter contends that Evans' opinion that VS Technologies would be entitled to 15% to 40% of Twitter's incremental revenue is based only on Evans' *ipse dixit*. Lastly, Twitter asserts that Evans' conclusion that Twitter would have agreed to pay VS Technologies $20 to $25 million in the hypothetical negotiation is pure speculation. Twitter claims that Evans "fails to offer any logical connection between his conclusion and his prior analysis or any explanation of why he chose $20 to $25 million rather than $10,978,000, the low end of his 'benchmark' range." Id. at 13. In conclusion, Twitter requests that this Court exclude Evans' testimony on the basis that it is mere "speculation and guesswork, bootstrapped with his own *ipse dixit*." Id. at 14.

For its part, VS Technologies asserts that "[t]he methods used by Mr. Evans but not adopted by Twitter—the effect of the actual use of the feature on Twitter user activity and revenue and the incremental benefit method—are clearly reasoned and based upon documents and testimony provided by Twitter along with Mr. Evans' vast licensing experience."[2] Doc. 67

---

[1] According to Twitter, "[t]he 5%-7% figures used by Evans come from an internal effort by Twitter to measure the 'engagement' of new Twitter users based on the number and frequency of new users' use of Twitter during the first week following their use of the allegedly infringing suggested 'Interests' feature." Doc. 63 at 8. As such, Twitter asserts that such figures are misleading because they fail to "measure how or whether these new users continue to use Twitter (if at all) in later weeks and months." Id.

[2] VS Technologies maintains that "this Court has previously acknowledged Mr. Evans' longevity in the field of damages assessment and allowed his expert testimony in a similar situation where the opposing party provided the underlying data but disputed the plaintiff's reliance on it as part of the reasonable royalty calculation." Doc. 67 at 4

at 4. VS Technologies points out that the experts on both sides "have outlined the Georgia-Pacific factors in their reports, and neither party appears to dispute their use in the determination of the damages owed VS Technologies." Id. at 5. According to VS Technologies, the three following methods utilized by Evans are sound and reliable under the law: (1) the Market Approach; (2) Impact of the Infringing Feature on Use and Revenue; and (3) Incremental Revenue Sharing.

First, VS Technologies asserts that in applying the Georgia-Pacific factors, "Evans used the limited information provided by Twitter on these acquisitions and other publicly available information to determine two of the purchases were most analogous to the hypothetical negotiation." Id. at 6–7. VS Technologies explains,

> Mr. Evans used the apportionment of each sale price dedicated to the technology included in the transaction to calculate a similar purchase price for the technology claimed in the patent-in-suit. Importantly, this allocation information came directly from Twitter. Tellingly, Twitter's expert also relied upon the same two purchases used by Mr. Evans (along with one additional purchase) in doing his own analysis of a hypothetical negotiation.

See Doc. 63, Exhibit E.

Second, VS Technologies contends that "[i]n an effort to make his reasonable royalty calculation as concrete as possible and to avoid his own speculation on Twitter's future income,

---

(citing MercExchange, L.L.C. v. eBay, Inc., 275 F. Supp. 2d 695, 706 (E.D. Va. 2003)). In MercExchange, Judge Friedman found:

> Mr. Evans has negotiated numerous license agreements and has testified as an expert in many other disputes where a reasonable royalty is utilized. As stated in the Advisory Committee Notes, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Thus, while Mr. Evans' experience in and of itself is insufficient to form a reliable opinion, his experience along with his explanations as to how he applied his experience to the facts of this case is sufficient to meet the Daubert test.

MercExchange, 275 F. Supp. at 707. Judge Friedman concluded, "because the defendants were able to cross-examine Mr. Evans [on his] methods and principles in arriving at [his] opinion, what remained was a question of fact for the jury to decide." Id. at 708.

Mr. Evans relies on the projected revenue numbers provided by Twitter." Doc. 67 at 8. Specifically, VS Technologies asserts that Twitter's argument "ignores that a reasonable royalty is based on percentage of revenue, not of profit, so a current lack of profitablity—especially considering the projected increase in revenue over the next few years and the life of a patent through 2020—does not have the effect Twitter urges." Id. at 7.

Third, VS Technologies asserts that "Evans' extensive licensing experience, and 'specialized knowledge'" support his conclusion that "willing parties agree to share the incremental benefit attributable to the licensed feature somewhere in the range of 15% to 40% to the licensor." Id. at 10. VS Technologies distinguishes Evans' partial reliance on the incremental revenue sharing gained by the use of the patented technology from "the arbitrary, inflexible '25% rule of thumb' outlawed by Uniloc." Id. VS Technologies explains,

> The 25% rule had been used as simply an approximation of the share of profits to be retained by a licensor and did not take into consideration 'the importance of the patent to the profits of the product sold, the potential availability of close substitutes or equally noninfringing alternatives, or any of the other idiosyncrasies of the patent at issue that would have affected a real-world negotiation.'

Id. (quoting Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1313 (Fed. Cir. 2011)). According to VS Technologies, "Uniloc did not, nor have any other courts held that sharing of incremental benefit is an improper metric within the rubric of the Georgia-Pacific factors." Id.

Lastly, VS Technologies asserts that Fourth Circuit precedent does not support Twitter's argument. Specifically, VS Technologies maintains that the Fourth Circuit "permits Evans' use of incremental benefit sharing and 'experiential expert testimony,' which need not rely on a scientific method." Id. (citing Touchcom, Inc. v. Berreskin & Parr, 2010 U.S. Dist. LEXIS 115817, 7–8 (E.D. Va. 2010) citing United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007))). According to VS Technologies, Evans' has adequately explained "how his experience leads to

that opinion and how that experience is applied to the facts."[3] Doc. 67 at 11. Because an expert may rely primarily on his own experience to render an opinion, VS Technologies maintains that Evans is qualified to provide expert testimony in this matter.

While it is certainly the case that "a court should disregard expert opinion if it is mere speculation, not supported by facts," Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937, 943 (E.D. Va. 1994), aff'd, 74 F.3d 1230 (4th Cir. 1996), Evans' testimony rests upon a sufficient factual basis to support his conclusion. As VS Technologies asserts, Evans bases his opinion upon his experience as applied to the facts of the case. Evans has over forty (40) years of experience in the area of the licensing of patents, trademarks and technologies. In those forty (40) years, Evans estimates that he has "has been involved in the negotiation of more than 400 licenses, as licensor or as licensee." Evans Report at ¶ 3. Accordingly, Evans possesses the requisite knowledge, skill, experience, training and education to determine the relevant range for likely revenue sharing between a willing licensor and licensee and apply it to the facts of this case.

In support of its argument, Twitter cites two cases in which the court excluded the testimony of the patentee's damages expert. First, Twitter relies upon IP Innovation, LLC v. Red Hat, Inc., 705 F. Supp. 2d 687 (E.D. Tex. 2010). In IP Innovation, the court excluded an expert's unreliable proffered evidence on the basis that it was lacking in sound economic and factual predicates. In excluding such evidence, the court focused on the following factors: (1) the expert "made no effort to factor out of his proffered royalty base [those] products which do not

---

[3] Evans' report explains that his

> actual licensing experience [explained in pages 1 through 11 of his report] has informed me that licensors and licensees begin negotiations, where there are no other logical metrics (such as prior licenses granted by the patentee or taken by the licensee) by sharing incremental revenue on some reasonable basis, such as 15% to 40% to the licensor/patentee and 60% to 85% to the licensee.

Evans Report at ¶ 57.

10

even feature the claimed invention;" (2) the expert "made no effort to factor out of his proffered royalty base those operating systems in which the user never affirmatively enables the claimed [invention];" and (3) the expert "arbitrarily picked a royalty rate that is much higher than the existing royalty rates for licenses to the patents-in-suit." IP Innovation, 705 F. Supp. 2d at 690–91. The expert relied upon a 2004 publication "as a 'starting point' for determining the royalty rate." Id. at 691. The publication delineated an average royalty rate for the Software industry; however, as the court noted, the "'software industry' and 'computer and electronic products manufacturing industry' encompass much more than the desktop switching feature at issue in this case." Id. Because the expert relied upon general market studies instead of an "analysis with reference to the patents-in-suit", the court determined that the necessary economic connection was lacking and thus, excluded the testimony as irrelevant and unreliable. Id.

The expert's testimony in IP Innovation can be distinguished from Evans' proposed expert testimony. Evans does not rely upon general market studies, but rather his forty (40) years of experience in dealing with the negotiation of more than four hundred (400) licenses. Furthermore, this is not a case in which the expert failed to factor out of his proffered royalty base products not featuring use of the claimed invention. As VS Technologies asserts, Evans' analysis consists of "the likely share of the incremental benefit as it directly relates to the benefit received by Twitter from use of the invention—a 5 to 7% increase in use of the Twitter system and the effect that has on advertising revenue." Doc. 67 at 1. Evans' proposed testimony does not suffer from the same defects highlighted by the court in IP Innovation. Twitter will be able to cross-examine Evans concerning his principles and methodologies at trial. It is for the jury to determine the appropriate weight to be accorded this testimony along with any other damages evidence presented by VS Technologies.

Twitter also cites another case, Cornell Univ. v. Hewlett-Packard Co., 609 F. Supp. 2d 279 (N.D.N.Y. 2009), in support of the assertion that Evans' proposed testimony is unreliable because of his failure to use proper economic methodologies. In Cornell Univ., a jury rendered a verdict for the patent owner, and the competitor moved for judgment as a matter of law to reduce the royalty base to include only its earnings attributed to the infringing technology or, in the alternative, a remittitur of damages awards. In making its decision, the court excluded the testimony of the damages expert because of his failure to comply with the court's exclusion order. Specifically, the expert "had offered his opinion that Hewlett-Packard's server and workstation revenues were the appropriate royalty base in the case," although the court had ordered that "the proffered royalty base [must] take into account the fact that 'the claimed invention is not the entire system but only a component of a component of that system.'" Cornell Univ., 609 F. Supp. 2d at 290. Because the expert ignored the boundaries set by the court and did not limit his opinion to only seek compensation for the value of the claimed invention, the court excluded his testimony. Id. This case is inapposite to the instant one because Evans' proposed testimony does not seek to extend damages to any features not encompassed within the claimed invention. As such, this case does not serve as a basis for excluding Evans' proposed testimony.

Furthermore, VS Technologies is correct in asserting that the expert's testimony at issue in Uniloc can be distinguished from Evans' proposed expert testimony. First, the expert's testimony in Uniloc "was based on the use of the 25% rule of thumb as an arbitrary, general rule, unrelated to the facts of the case." Uniloc, 632 F.3d at 1318. Second, the expert revealed upon further questioning "that he had been involved in only four or five non-litigation related negotiations." Id. Third, the expert in Uniloc "did not base his 25 percent baseline on other

licenses involving the patent at issue or comparable licenses." Id. Based on these factors, the Uniloc court determined that the expert's testimony was "arbitrary, unreliable, and irrelevant" because "his starting point of a 25 percent royalty had no relation to the facts of the case." Id.

Twitter has failed to demonstrate that Evans' proposed testimony suggests that he possesses infirmities similar to the expert in Uniloc. Evans' opinion is rendered on the basis of his experience, and Twitter has failed to show that Evans is unable to back up his figures and reasonable royalty calculation. Rather than focusing on some particular weakness of the test Evans' relies upon in making his calculation, Twitter seeks to exclude all of his testimony. However, at this stage, it cannot be concluded that Evans should be precluded from testifying. This Court need not determine whether the expert's testimony is correct. Certainly, the extent of Evans' experience and factual underpinnings for his conclusions remain properly the subject of cross-examination at trial. Accordingly, this Court **FINDS** that Evans should be permitted to testify and **DENIES** Twitter's Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial, Doc. 57.

## IV. CONCLUSION

For the reasons stated herein, Evans should be permitted to testify. Accordingly, the Court **DENIES** Defendant Twitter's Motion to Strike Expert Report and Preclude Larry W. Evans from Testifying at Trial, Doc. 57.

The Clerk is **REQUESTED** to send a copy of this order to all counsel of record.

It is so **ORDERED**.

                /s/
                oke Morgan, Jr.
                d States District Judge

*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
Date: October 4, 2011